IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>JAMES E. THOMPSON,<br><br>　　　　　　Defendant. | 8:14CR291<br><br>FINDINGS AND<br>RECOMMENDATION |

　　　　This matter is before the court on the defendant's, James E. Thompson (Thompson), Motion to Suppress (Filing No. 17). Thompson is charged in Count I of the Indictment with a conspiracy to distribute and possess with intent to distribute marijuana during the period of July 1 to July 20, 2014, in violation of 21 U.S.C. § 841(a)(1) and 846. *See* Filing No. 1 - Indictment. Thompson is charged in Count II of the Indictment with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). *Id.* In Count III of the Indictment, Thompson is charged with traveling in interstate commerce from the State of Wisconsin to the State of Colorado with intent to distribute proceeds of an unlawful drug activity in violation 18 U.S.C. § 1952(a)(1). *Id.* Thompson seeks to suppress any evidence seized as a result of a traffic stop and search of his vehicle on July 20, 2014. Thompson also seeks to suppress his arrest and subsequent statements made to law enforcement officers.

　　　　The court held a hearing on the motion on December 4, 2014. Thompson was present with his counsel, John S. Berry, Jr. and Justin B. Kalemkiarian. The United States was represented by Assistant United States Attorney Thomas J. Kangior. The court heard testimony from Omaha Police Department (OPD) Officer Jodi Sautter (Officer Sautter) and Homeland Security Investigations (HSI) Special Agent Andrew Vincik (Special Agent Vincik). The court received into evidence: Ex. 1 - DVD recording of the traffic stop; Ex. 2 - photograph of vehicle interior; Ex. 3 - photograph of the vehicle's cubby hole and vents; Ex. 4 - photograph of a vest and helmet; and Ex. 5 - *Miranda* form. The court also took judicial notice of Nebraska Revised Statutes §§ 60-6139 and 60-6140. A transcript (TR.) of the hearing was prepared and filed on December 8, 2014. *See* Filing No. 33. There was no post-hearing briefing.

## FINDINGS OF FACT

On July 20, 2014, Officer Sautter, an officer with OPD for over twelve years and assigned to the K-9 unit, parked her marked police cruiser along the inside shoulder of I-80 westbound at approximately 103rd Street (TR. 4-5, 11). Officer Sautter had her police canine, Tye, with her in the cruiser (TR. 11). The weather was "nice . . ., sunny, [and] clear" and the traffic was "light to medium" (TR. 13). Officer Sautter observed a dark blue GMC pickup drive by her marked OPD cruiser while following a Kia Soul (Kia) "at a very close rate" (TR. 4-5, 11). Officer Sautter noted the GMC was "[a]bout one car length" behind the Kia (TR. 12). The GMC and Kia were approximately twenty feet from Officer Sautter when the vehicles passed her cruiser (TR. 12). According to Officer Sautter's understanding of the law in regard to following another vehicle, "[y]ou need to leave enough prudent distance to make it -- to be able to stop in case that vehicle makes a sudden stop without running into the back of it." (TR. 12-13). Officer Sautter uses a two-second rule to determine if a vehicle is following too closely (TR. 41-42, 59).

After the vehicles passed, Officer Sautter pulled out from her parked position and followed the vehicles (TR. 12). Officer Sautter used her stopwatch to detect how closely the GMC followed the Kia (TR. 12). When the Kia's back tires passed a line in the cement, Officer Sautter pushed the stopwatch's start button and when the front tires of the GMC passed the same line in the cement, Officer Sautter pushed the stopwatch's stop button (TR. 13). The difference in time was seven-tenths (.7) of a second (TR. 13). Officer Sautter did not consider the distance to be a reasonable and prudent distance because, in her estimation, the vehicles were traveling at sixty miles per hour and it takes a vehicle over 200 feet to come to a complete stop (TR. 13-14). Based on Officer Sautter's observations, she believed the GMC was in violation of a Nebraska state statute (TR. 14).

After witnessing what Officer Sautter believed to be a traffic violation, Officer Sautter pursued the GMC to effectuate a traffic stop (TR. 15). As Officer Sautter followed the GMC, Officer Sautter witnessed the GMC's driver-side tires cross, for a second, the yellow lane divider on the shoulder (TR. 16, 46, 57; Ex. 1). Officer Sautter noted a semi-truck drove in the lane next to the GMC and the Kia drove behind the semi-truck, both of which were within their lanes (TR. 16-17, 57-58). The semi-truck did

not come close to leaving its lane (TR. 17; Ex. 1). Officer Sautter believed the GMC's driver committed a second traffic violation by failing to maintain the driver's lane (TR. 16-17, 44-45). Thereafter, Officer Sautter activated her cruiser's lights and Officer Sautter effectuated a traffic stop under the L Street bridge on westbound I-80 (TR. 17-18; Ex. 1). Upon activating her cruiser's lights, a recording device in her cruiser began operating (TR. 16, 43). Although the recording tracks back thirty seconds from the time it is activated, the recording did not capture the GMC following too closely to the Kia but did capture the GMC crossing the yellow line (TR. 16, 43; Ex. 1).

Officer Sautter approached the GMC and made contact with the driver (TR. 18). Officer Sautter asked for and received the driver's license, registration, and insurance (TR. 18). Officer Sautter identified Thompson as the driver (TR. 18). While Thompson retrieved the requested documents, Officer Sautter looked around the GMC to look for any weapons or items that could cause her harm (TR. 18). Officer Sautter noticed there were five air fresheners in the GMC, and one air vent had two air fresheners (TR. 19, 47; Exs. 2 and 3). According to Officer Sautter's training, having several air fresheners usually indicates a person is trying to cover up an odor like narcotics (TR. 19). Officer Sautter also noticed there was not a lot of luggage visible, only a small gym bag, and there were two phones, a flip phone and a smart phone, in the GMC (TR. 19-21). The two phones caught Officer Sautter's attention because people who transport narcotics have two cell phones and would use one phone as a throw-away phone (TR. 20). Officer Sautter further noticed a construction safety helmet and a clean, brand new construction vest (TR. 20; Ex. 4). The vest was unusual to Officer Sautter because she believes if you work construction, your vest is usually dirty and people transporting narcotics across state lines also try to "throw off" officers by placing things in their vehicle (TR. 20-21). Officer Sautter also noted the back of the truck had a cover and she was unable to determine whether luggage was inside (TR. 50). Based on her initial observations, Officer Sautter had a suspicion of criminal activity and wanted to question Thompson (TR. 21-22).

Thereafter, Officer Sautter asked Thompson to accompany her to her cruiser while she checked Thompson's information (TR. 21). Thompson sat in the passenger seat of the cruiser (TR. 22-23). Thompson was "a little bit nervous. His hands were

shaking when he handed [Officer Sautter] the paperwork. When he got back to the cruiser, he was picking at this hands quite a bit. He had deep breaths and his feet were constantly moving." (TR. 22). Officer Sautter considered his demeanor unusual because she already informed Thompson she would only write him a warning for the traffic violations if his documents "checked out" (TR. 22, 25-26). While Officer Sautter conducted the checks, she asked Thompson some background questions (TR. 23). Thompson stated he was driving from Wisconsin to visit his Army friends in Colorado for around three days (TR. 23). Although Thompson did not have a hotel, he planned on locating one when he arrived in Colorado (TR. 23). Officer Sautter thought Thompson's travel itinerary was unusual (TR. 24). Thompson named his friends by their rank and last name, which Officer Sautter thought was unusual because Officer Sautter's family and friends in the military do not refer to their friends by rank (TR. 23-24). After Thompson told Officer Sautter he was in construction, Officer Sautter noted it was unusual to take time off during the prime season for construction (TR. 24). Thompson explained he was laid off for six weeks because his arm was injured (TR. 24-25, 50). Thompson also stated he was unemployed (TR. 58). Thompson's nervousness never subsided during Officer Sautter's encounter with him in the cruiser (TR. 25). Thompson gave short answers to questions at first and then started mentioning off-topic subjects (TR. 25). Based on Officer Sautter's observations, she thought Thompson's actions were unusual and suspicious (TR. 58-59).

Officer Sautter subsequently provided Thompson with a warning ticket and told him he could leave (TR. 26; Ex. 13:15). As Thompson reached for the door and started to leave, Officer Sautter asked if she could ask him one more question (TR. 26). The recording reveals the following discussion, starting at the 14:15 mark, occurred:

    Officer:    Alright, you're good to go.
    Thompson:    Thank you ma'am.
    Officer:    I did have one more question. Do you care if I search your vehicle?
    Thompson:    Uh, no, I mean, I don't care, but…
    Officer:    OK, I'm just looking for large amounts of narcotics or money going through.
    Thompson:    Uh, I don't want you to search it, no.
    Officer:    Ok, I'll tell you what, what I'm going to do is I'm going to run my dog and if he hits on your car,

4

|  |  |
|---|---|
|  | I'm going to search it, if he doesn't you'll be on your way. |
| Thompson: | Alright. |
| Officer: | Sit tight. |

(Ex. 1 - 14:15; TR. 26-28).

Before Officer Sautter deployed Tye, she needed assistance from another officer to divert traffic for safety reasons (TR. 27-28). Officer Sautter called Officer McKinney for backup and waited approximately fourteen minutes for Officer McKinney to arrive (TR. 28, 54). After Officer McKinney arrived and diverted traffic from the traffic lane near the GMC and the officers, Officer Sautter deployed Tye (TR. 29; Ex. 1). Officer Sautter retrieved Tye's toy and placed it in her vest to give to Tye as a reward if he indicated or alerted to the odor of narcotics (TR. 29). Officer Sautter gave Tye the command, using the word "gift," to sniff the GMC (TR. 30; 55). Officer Sautter would point with her hand where she wanted Tye to sniff (TR. 31). Tye began his sniff at the rear, driver-side tailgate area, and then progressed up the driver's side and the front of the GMC (TR. 30; Ex. 1). Officer Sautter turned Tye around and came back down the front and driver's side of the GMC (TR. 30; Ex. 1). Tye alerted to an area around the tailgate (TR. 30-31; Ex. 1). Officer Sautter directed Tye to sniff the rear area of the GMC, including the cover over the bed of the truck, and Tye continued to alert (TR. 31; Ex. 1). At that point, Tye immediately sat down without Officer Sautter's command (TR. 32; Ex. 1). By Tye sitting, he indicated to Officer Sautter that he located the odor of narcotics (TR. 32). Officer Sautter then gave Tye his toy as a reward and returned Tye to the cruiser (TR. 32). Officer Sautter never ran Tye down the passenger side of the GMC (Ex. 1; TR. 33, 54).

When Officer Sautter returned to the cruiser, she had the following discussion with Thompson:

| Officer: | Well, my dog indicated the odor of narcotics, is there anything you want to tell me? Did you smoke in there anytime recently because he'll hit on it if you smoked. |
|---|---|
| Thompson: | Well I, I had a bag in there like four days ago, but that's about it. |
| Officer: | That's it? |
| Thompson: | Yeah. |

5

> Officer: Ok, well I'm gunna search it because he indicated on it and you know like I said if you smoked in there recently or there was something in there he'll indicate on it.
> Thompson: [Indecipherable]
> Officer: If nothing is in there, we'll get you on your way, alright?
> Thompson: [Indecipherable] OK, yeah.

(Ex. 1 - 29:56; TR. 32-33). Thompson was placed in handcuffs (Ex. 1 - 32:49). Officers Sautter and McKinney commenced a search of the GMC (Ex. 1; TR. 33-34). The officers observed a new duffel bag with the price tag still attached and opened the bag (TR. 33-34). Inside the bag, the officers discovered a plastic bag containing heat sealed plastic bags of U.S. currency and some type of liquid on the bags (TR. 33-34). Officer McKinney approached Thompson in the cruiser and had the following conversation:

> Officer: What do you got on that bag?
> Thompson: What bag?
> Officer: The bag. In the back. What do you got on it? Is there something that's gunna to hurt me?
> Thompson: No sir.
> Officer: Huh?
> Thompson: No.
> Officer: You sure?
> Thompson: Yes.
> Officer: If it's something that's gunna hurt me, it's gunna be a lot worse than what you're in right now, do you understand me?
> Thompson: No, sir, it's just bleach and water, that's it.

(Ex. 1 - 34:45; TR. 34-35).

After the officers located the bag, the GMC was taken to the impound lot to continue the search in a safer area (TR. 35). The recording stopped once the officers arrived at the impound lot (Ex. 1). At the impound lot, officers located methamphetamine inside the GMC's center console (TR. 35-36). The search at the impound lot took about thirty minutes during which time HSI interviewed Thompson (TR. 36). After the money and narcotics were found, Thompson was arrested (TR. 36-37). A search of his person revealed a methamphetamine pipe (TR. 37).

Officer Sautter testified she considers Tye to be a reliable drug-detecting K-9 because of her continual training experience with Tye (TR. 40-41). Tye was last

6

certified on May 16, 2014 (TR. 40). Officer Sautter explained she started training with Tye in March 2014 and the type of training performed (TR. 6-11).

Special Agents Vincik, a twelve-year special agent with HSI, and Eric Cardiel (Special Agent Cardiel) interviewed Thompson at the OPD impound lot break room (TR. 62-64). At approximately 1:00 p.m., Special Agent Vincik was informed he was needed for an interview of an individual who was the driver of a vehicle with money (TR. 63). Special Agents Vincik and Cardiel were wearing plain clothes with no weapons displayed, although their weapons were concealed (TR. 64, 70-71). Special Agent Vincik unhandcuffed Thompson for the interview (TR. 72). Thompson appeared frustrated and concerned during the interview (TR. 65). Special Agent Vincik identified himself, explained why he was present, and then read Thompson's *Miranda* rights (TR. 65). Special Agent Vincik used a HSI *Miranda* rights form (TR. 66; Ex. 5). Special Agent Vincik read each statement on the form to Thompson and did not have any trouble communicating with Thompson (TR. 66-67). After reading Thompson's rights verbatim from the HSI *Miranda* rights form, Thompson read and signed the form and agreed to speak with Special Agent Vincik at approximately 1:30 p.m. (TR. 67-68; Ex. 5). Special Agent Vincik testified neither he nor Special Agent Cardiel threatened, promised, or coerced Thompson into signing the form and speaking with the special agents (TR. 68-70). Thompson thereafter answered some questions about the money discovered in the GMC but refused to answer other questions, such as the identity of any co-conspirators (TR. 68-69). The interview, which lasted thirty-five to forty-five minutes, was not recorded (TR. 69-70, 72).

## LEGAL ANALYSIS

### A. Traffic Stop

"A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause." **United States v. Houston**, 548 F.3d 1151, 1153 (8th Cir. 2008); **see also United States v. Hollins**, 685 F.3d 703, 705-06 (8th Cir. 2012). "A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver. An officer is justified in stopping a motorist when the officer objectively has a reasonable basis for believing that the driver

7

has breached a traffic law." ***United States v. Coleman***, 700 F.3d 329, 334 (8th Cir. 2012) (internal quotations and citations omitted). "An otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search." ***United States v. Wright***, 512 F.3d 466, 471 (8th Cir. 2008) (internal quotation marks omitted); **see also *United States v. Gunnell***, No. 13-3234, slip op. at 4-5 (8th Cir. Jan. 12, 2015).

According to Neb. Rev. Stat. § 60-6,139:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this section, shall apply:
> (1) A vehicle shall be driven as nearly as practicable within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety;

Neb. Rev. Stat. § 60-6,139. Additionally, Neb. Rev. Stat. § 60-6,140 provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway." Neb. Rev. Stat. § 60-6,140(1).

In the instant matter, Officer Sautter observed Thompson's GMC follow too closely to the Kia. **See** TR. 11-14, 41-42, 59. Officer Sautter testified she measured Thompson was seven-tenths (.7) of a second behind the Kia and at his rate of speed, she did not believe that was a reasonable and prudent distance. *Id.* at 13. The court credits Officer Sautter's testimony Thompson followed too closely to the Kia. Additionally, Officer Sautter observed Thompson's GMC cross the yellow dividing line. *Id.* at 16, 46, 57. The recording of the stop corroborates Officer Sautter's testimony Thompson crossed the yellow dividing line. **See** Ex. 1. As these two actions are in violation of Neb. Rev. Stat. §§ 60-6,139 and 60-6,140, respectively, the court finds Officer Sautter had probable cause to conduct a traffic stop.

### B. Continued Detention
#### 1. Reasonable Suspicion

Contemporaneous with a valid traffic stop, the officer may "conduct an investigation that is reasonably related in scope to the circumstances that initially

8

justified the stop." *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010). In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013); see also *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip and whether the police officer may search the vehicle. *Id.*; *United States v. Mendoza,* 677 F.3d 822, 828 (8th Cir. 2012).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)); see also *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers. *Bracamontes*, 614 F.3d at 816; see also *United States v. Lyons*, 486 F.3d 367, 371-72 (8th Cir. 2007); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999). In any event, the scope and length of any investigation must be reasonable. *Mendoza,* 677 F.3d at 828. "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008); see also *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 (8th Cir. 2011).

"To be reasonable, suspicion must be based on 'specific and articulable facts' that are 'taken together with rational inferences from those facts'-that is, something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) (**quoting** *Terry v. Ohio*, 392 U.S. 1, 21, 29 (1968)). Whether reasonable suspicion exists "is determined by looking at the totality of the circumstances, in light of the officer's experience." *United States v. Bracamontes*, 614 F.3d 816 (**quoting** *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010)). "[F]actors that individually may be consistent with innocent behavior, when taken

9

together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *Stewart*, 631 F.3d at 457.  "A constitutionally permissible traffic stop can become unlawful . . . if it is prolonged beyond the time reasonably required to complete its purpose." *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014) (internal citation omitted).

When the court combines all of the individually innocent factors, the court finds only a totality of innocent circumstances insufficient to provide Officer Sautter, in light of her training and experience, reasonable suspicion to extend the traffic stop. Thompson's supposed nervousness, even when combined with the other factors, is of limited significance and insufficient to create reasonable suspicion.  **See** *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) ("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.").  The combination of air fresheners, two phones, only one visible bag, referring to military friends to a stranger by rank and last name, clean construction gear, and no hotel reservation do not rise to more "inchoate and unparticularized suspicion or hunch." **See** *United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004) ("The use of air fresheners shows that [the defendant] either liked the smell of air fresheners or that he was trying to cover up an odor, but that odor need not be the smell of drugs.").  The possession of two phones is quite innocuous considering multiple people, Officer Sautter included, utilize a work phone and personal phone.  Although Thompson had a flip phone in his possession, there is no evidence the phone was a "throw-away" phone. Taken together, these factors do not amount to reasonable suspicion Thompson engaged in criminal activity.

### 2. Dog Sniff

The Eighth Circuit recently summarized the law applicable to a dog sniff in a similar context:

> [A] dog sniff conducted during a traffic stop that is "lawful at its inception and otherwise executed in a reasonable manner" does not infringe upon a constitutionally protected interest in privacy.  *United States v. Martin*, 411 F.3d 998, 1002 (8th Cir. 2005) (**quoting** *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).  We have held that once an "officer

> decides to let a routine traffic offender depart with a ticket, a warning, or an all clear[,] . . . the Fourth Amendment applies to limit any subsequent detention or search." **United States v. $404,905.00 in U.S. Currency**, 182 F.3d 643, 648 (8th Cir. 1999). Accordingly, a dog sniff may be the product of an unconstitutional seizure, "if the traffic stop is unreasonably prolonged before the dog is employed." **Martin**, 411 F.3d at 1002 (**citing Caballes**, 543 U.S. at 407). A brief delay to employ a dog does not unreasonably prolong the stop, however, and we have repeatedly upheld dog sniffs that were conducted minutes after the traffic stop concluded. **See, e.g.**, **United States v. Alexander**, 448 F.3d 1014, 1017 (8th Cir. 2006) (four-minute delay upheld as a *de minimis* intrusion on personal liberty); **Martin**, 411 F.3d at 1002 (two-minute delay upheld); **United States v. Morgan**, 270 F.3d 625, 632 (8th Cir. 2001) (delay of "well under ten minutes" upheld); **$404,905.00 in U.S. Currency**, 182 F.3d at 649 (two-minute delay upheld).

**United States v. Rodriguez**, 741 F.3d 905, 907 (8th Cir. 2014)[1]; **see also United States v. Mohamed**, 600 F.3d 1000, 1005 (8th Cir. 2010) (five-minute delay); **United States v. Rivera**, 570 F.3d 1009, 1014 (8th Cir. 2009) (three and a half minutes delay). In **Rodriguez**, the Eighth Circuit held, although the dog was located in the patrol car with the officer at the scene, due to safety concerns, a seven- or eight- minute wait for a second officer to arrive at the scene of the stop was a *de minimis* intrusion on the defendant's personal liberty. **Id.** at 907-08.

At the 13:50 mark in the recording, Officer Sautter gave Thompson a warning citation and Officer Sautter told Thompson he was free to leave at the 14:15 mark. **See** Ex. 1. At this point, the traffic stop was complete. **See Johnson**, 555 U.S. at 333 ("[N]ormally, [a traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."); **see also $404,905.00 in U.S. Currency**, 182 F.3d at 649. It was not until the 28:12 mark in the recording that Officer Sautter deployed Tye. **Id.** Here, the stop was unreasonably prolonged for nearly fourteen minutes without reasonable suspicion or other justification. This court will not continue to incrementally increase the *de minimis* intrusion. This case is distinguishable from other cases wherein the officer, upon having reasonable

---

[1] The court is aware this case is currently before the Supreme Court of the United States. **See** 135 S. Ct. 43 (2014), cert. granted.

11

suspicion of criminal activity, waited for a drug dog to arrive at the scene, sometimes in a rural area, of the traffic stop. **See, e.g.**, *Lyons*, 486 F.3d at 372 (collecting cases). In this matter, Officer Sautter was not in a remote location and had a drug dog in her cruiser. This intrusion, without reasonable suspicion or other justification, violated Thompson's constitutional rights. As a result of the illegal detention, any physical evidence seized should be suppressed. **See *United States v. Cotter***, 701 F.3d 544, 547 (8th Cir. 2012).

The court also finds Thompson did not consent to the detention, the search, or the dog sniff. Although Thompson said "alright" after Officer Sautter stated she would utilize the drug dog, this was not in response to a request or question, but merely an acknowledgment Officer Sautter intended to use the drug dog. Further, Officer Sautter stated Thompson could "be on [his] way" after Officer Sautter deployed the drug dog.

**C.    Statements**

"The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." ***United States v. Fiorito***, 640 F.3d 338, 345 (8th Cir. 2011). "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." ***United States v. Yousif***, 308 F.3d 820, 827 (8th Cir. 2002). Accordingly, "[s]tatements that result from an illegal detention are not admissible." ***United States v. Hernandez-Hernandez***, 384 F.3d 562, 565 (8th Cir. 2004) (**citing *United States v. Ramos***, 42 F.3d 1160, 1164 (8th Cir. 1994)). "To break the causal chain between an illegal arrest and a statement given later, the statement must be sufficiently an act of free will to purge the primary taint." ***United States v. Vega-Rico***, 417 F.3d 976, 979 (8th Cir. 2005) (internal quotation marks omitted). "The giving of *Miranda* warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility." ***Vega-Rico***, 417 F.3d at 979. "Instead, to decide whether a confession is the product of a free will, [we] consider *Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." ***Id.***

12

In light of the case law cited above, the court finds Thompson's statements should not be suppressed as fruit of the illegal detention.[2] First, Thompson was fully advised of his **Miranda** rights before making any statements. Thompson waived his rights in writing and agreed to speak to the special agents. As explained below, there is no evidence Thompson's waiver or statements were involuntarily made.

Second, there were intervening circumstances in this case between the constitutional violation and Thompson's statement "making it more probable the statements were a product of [the defendant's] free will rather than of the illegal [conduct]." **United States v. Riesselman**, 646 F.3d 1072, 1080 (8th Cir. 2011). Special Agents Vincik and Cardiel are from a different law enforcement agency and there is no evidence the special agents or HSI participated in the violation of Thompson's constitutional rights. There is no evidence Special Agents Vincik and Cardiel had knowledge Thompson was illegally detained. Additionally, Thompson's interview took place at a location separate from the constitutional violation. Although Thompson was in custody and the interview occurred approximately thirty minutes to an hour after Thompson was illegally detained, the court concludes Thompson's statements should not be suppressed. **See Riesselman**, 646 F.3d at 1080 (noting circumstances surrounding interview supported voluntariness, despite fifteen to twenty minute span between violation and interview); **Vega-Rico**, 417 F.3d at 979-80 (stating a defendant's statements made while in custody four days after the Fourth Amendment violation were admissible, in part, because the interview was conducted by an agent from a separate law enforcement agency, and neither agent nor agency had any involvement in the initial Fourth Amendment violation).

Third, Officer Sautter's violation of Thompson's constitutional rights was not flagrant. The extended detention following the conclusion of the traffic stop was motivated out of Officer Sautter's safety concerns and not some design to violate Thompson's rights. There is no evidence of bad faith on the part of the officers.

In order for evidence obtained as a result of custodial interrogation to be used against a defendant at trial, the Fifth Amendment requires an individual to both be

---

[2] The court notes Thompson did not argue his statements were involuntary or that there was a violation of **Miranda**. **See** TR. 84.

advised of his constitutional rights by law enforcement and to make a valid waiver of those rights. **See** *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). Before questioning begins, a suspect in custody must be informed of the following: (1) he has the right to remain silent; (2) his statements may be used against him in a court of law; (3) he has the right to an attorney; and (4) if he cannot afford an attorney, one will be appointed. *Miranda*, 384 U.S. at 444, 469-70, 478-79. The purpose of the warning is to ensure that the suspect is "aware of the privilege against self-incrimination, under[stands] the consequences of waiving this privilege, and recognize[s] the adversarial nature of the proceedings." *United States v. Johnson*, 47 F.3d 272, 277 (8th Cir. 1995). "Neither the *Miranda* decision nor its progeny require the police to ask a suspect explicitly whether [the suspect] understands his rights." *United States v. Mayhew*, 380 F. Supp. 2d 915, 921 (S.D. Ohio 2005) (failing to explicitly question if the defendant understood did not "vitiate the legality of defendant's waiver").

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court follows a two-step process:

> First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the suspect must have waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted). A court "consider[s] the totality of the circumstances in determining whether a suspect's waiver is valid." *United States v. Gayekpar*, 678 F.3d 629, 638 (8th Cir. 2012). "The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

Although Thompson was subjected to a custodial interrogation, Thompson was *Mirandized*. Thompson acknowledged receiving his rights and validly waived his rights by signing the HSI *Miranda* rights form. **See** Ex. 5; TR. 67-68. Special Agent Vincik testified neither he nor Special Agent Cardiel threatened, promised, or coerced Thompson into signing the form and speaking with the special agents. **See** TR. 68-70.

14

Additionally, Thompson was unhandcuffed and there is no evidence Thompson was impaired during the interrogation. The totality of the circumstances indicate Thompson's waiver and statements were voluntary. Further, assuming, *arguendo*, there are no constitutional infirmities with Thompson's detention following the conclusion of the traffic stop, Thompson's statements would not otherwise be suppressed. Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Thompson's Motion to Suppress (Filing No. 17) be granted as to the items seized from Thompson's GMC, but denied as to Thompson's statements to the HSI officers.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 13th day of January, 2015.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge